# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION |
| OMAR BERNARD, | NO. 20-00208 |
| *Defendant*. | |

## MEMORANDUM

**PAPPERT, J.**                                                                                        November 2, 2020

      Omar Bernard was charged by indictment with one count of possession of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1) and 924(e). Bernard moves to suppress all evidence gathered from a search of his residence pursuant to a warrant. He contends that the affidavit of probable cause supporting the warrant application omitted material information that the affiant had a duty to disclose. Bernard also argues the search violated the Fourth Amendment because the executing officer failed to end the search when he discovered, or reasonably should have discovered, that the warrant lacked particularity. The Government filed a Response, and the Court held a suppression hearing on October 19, 2020. For the reasons that follow, the Court denies the Motion.

I

A[1]

On February 7, 2020, Latoya Baker reported an instance of domestic violence to the Philadelphia Police. (Def's Br. in Support of Suppression, Attachment B, ECF No. 14-1.) Baker told Detective Mary Kuchinsky that her boyfriend, Omar Bernard, hit and threatened to shoot her inside their home at 5142 Harlan Street in Philadelphia. (*Id.*) Baker also reported that Bernard kept several unregistered firearms in the home and that he dealt drugs "out of the apartment." (*Id.*) Detective Kuchinsky memorialized these statements in an Investigation Interview Record. (*Id.*) In that record, Detective Kuchinsky noted that Baker lived with Bernard in an "apartment at 5142 Harlan St. 2nd fl[oor]." (*Id.*)

Detective Kuchinsky referred the case to Detective David Palma, who at the time was serving on the Gun Violence Reduction Task Force. (Hr'g Tr. 8:8–10, 7:18–19.) Before seeking a search warrant for 5142 Harlan Street, Detective Palma investigated the property to determine whether it was a single- or multi-unit dwelling. (*Id.* at 13:22–25, 14:1–17.) He viewed the home on Google Maps and did not observe separate entrances, mailboxes, doorbells or apartment numbers. (*Id.*) He also searched the property in the City of Philadelphia's police system, which indicated that the City had not zoned the property for separate apartments. (*Id.* at 14:8–12, 16:4–7.) Next, he cross-referenced that information on the City's property search website, which also indicated that the City had not zoned the home for apartments. (*Id.* at 14:13–17.) The

---

[1] Detective David Palma and Gisela Garcia, an investigator with the Federal Public Defender's Office, testified at the suppression hearing on October 19, 2020. The Court credits each witness's testimony.

record in that database also showed that the home is a two-story masonry rowhome with 840 square feet of living space. (*Id.* at 16:11–25, 17:1–7.) Detective Palma testified at the suppression hearing that he "did not find anything" during this preliminary investigation indicating the home at 5142 Harlan Street was divided into multiple apartments. (*Id.* at 16:4–7.)

Based on his investigation, Detective Palma submitted an affidavit of probable cause to a magistrate judge in Philadelphia on February 19, 2020 and obtained the next day a search warrant for the entirety of 5142 Harlan Street. (Def's Br. in Support of Suppression, Attachment C, ECF No. 14-1.) In the affidavit of probable cause, Palma made no reference to separate apartments within 5142 Harlan Street. (*Id.*) The warrant authorized officers to search for and seize items consistent with narcotics and firearms possession, including safes. (*Id.*) Detective Palma executed the warrant on February 21. (Hr'g Tr. 23:11–16.) Upon entering the home, he bypassed a closed door on the first floor, went upstairs and found Bernard in a second-floor bedroom. (*Id.* at 45:23–25, 46:1–7.) Palma recovered a set of keys in Bernard's room, which included a key to a safe. (*Id.* at 25:2–4.) The second floor also included a smaller room with a table and a refrigerator. (*Id.* at 26:5–7, 51:8–10.)

After concluding the second-floor search, Detective Palma returned downstairs, searched the area inside the front door of the residence and spoke to the resident living behind the "secured door" on the first floor. (*Id.* at 29:1–4, 27:21–25, 28:1–25.) Palma did not search behind this door because he determined the resident had no connection to Bernard. (*Id.* at 46:8–15.) While searching the unsecured first-floor area, he discovered a loaded semiautomatic rifle behind piled-up trash bags and other items.

3

(*Id.* at 30:19–20; Gov't Resp. Br. at 4; Bernard Indictment, ECF No. 1.) He also uncovered a locked safe. (Hr'g Tr. at 29:7–12.) Detective Palma used the key from Bernard's second-floor residence to unlock the safe, which revealed two loaded semiautomatic pistols and several identification cards belonging to Bernard. (*Id.* at 29:7–25; Gov't Resp. Br. at 4; Bernard Indictment.)

Although Detective Palma's preliminary investigation suggested 5142 Harlan Street is a single-unit dwelling, it was in fact a multi-unit dwelling divided into two separate apartments at the time of the search. *See* (Hr'g Tr. at 75:6–8, Def. Ex. 6–8, 12–14[2]). A locked door at the top of the stairwell separated Bernard's apartment from the rest of the property, and the apartment had its own bathroom and kitchen. (*Id.* at Def. Ex. 12–14, 16.) Both witnesses' suppression hearing testimony supports the additional finding that there was another apartment behind a wall and "secured door" on the first floor of the residence. *See* (*id.* at 27:24–25; 75:6–8.) Detective Palma reasonably should have discovered the multi-unit nature of the residence when he entered the home to execute the search warrant based on the physical layout of the home and the apparent lack of affiliation between the first-floor resident and Bernard. *See* (*id.* at 46:8–15, Def. Ex. 6–8, 12–14, 16). The testimony and evidence also support the finding that the first-floor area immediately inside the front door of the residence was a common area accessible to all tenants in the home. (*Id.* at 58:3–12) (area was devoid of furniture, did not lead to a bathroom or kitchen and provided access to entrances to both apartments).

---

[2] The Defendant's witness, Ms. Garcia, testified that she took the photographs of 5142 Harlan Street—introduced at the suppression hearing as Defense Exhibits—on September 15, 2020. (Hr'g Tr. 85:14–17.) There is no evidence that the home's general layout was any different on February 21, 2020.

B

Bernard moves to suppress all physical evidence, namely the guns, obtained during the search of 5142 Harlan Street. (Def's Br. in Support of Suppression at 1, ECF No. 14.) First, Bernard seeks a *Franks* hearing because he contends Detective Palma knowingly lied or omitted material information in obtaining the warrant to search the entire property. (*Id.*) He also argues the warrant was invalid for not specifying Bernard's second-floor apartment as the place to be searched. (*Id.*) He contends the execution of the warrant violated the Fourth Amendment because Detective Palma did not cease his search and obtain a more specific warrant once he entered the home and realized it was a multi-unit dwelling. (*Id.*) Finally, he argues that suppression is warranted and the good faith exception should not apply. (*Id.*)

The Government responds that 5142 Harlan Street is a single-unit dwelling, rendering the search warrant and its execution valid. (Gov't Resp. Br. at 1, ECF No. 15.) Alternatively, the Government argues that, even if the home is a multi-unit dwelling, the warrant was valid because Detective Palma reasonably believed it was a single-unit dwelling when he applied for the warrant. (*Id.* at 6–7.) The Government also contends the execution of the warrant was valid because Detective Palma limited his search to Bernard's second-floor residence and the first-floor common area. (*Id.* at 7.) Finally, the Government argues Bernard lacks Fourth Amendment standing to challenge the search of the safe and surrounding area because he lacked a reasonable expectation of privacy in the first-floor common area. (*Id.* at 1, 11–12.)

II

A

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Warrant Clause requires particularity "to prevent general searches" and "ensure[] that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Law enforcement officers violate the Fourth Amendment when they knowingly seek an overbroad search warrant, or when they execute a search warrant they know is overbroad. *Id.* at 85–86. Courts must evaluate alleged Fourth Amendment violations based on "the information available to [law enforcement] at the time they acted." *Id.* at 85. Accordingly, "a search warrant, 'insofar as it authorize[s] a search that turn[s] out to be ambiguous in scope,' will, nevertheless, be upheld against a particularity challenge if the warrant described the structure as it was known or should have been known to the officers after reasonable inquiry under the circumstances." *United States v. Ritter*, 416 F.3d 256, 266 (3d Cir. 2005) (quoting *Garrison*, 480 U.S. at 86) (alterations in original). Likewise, a search pursuant to an overbroad warrant does not violate the Fourth Amendment so long as the executing officers, once they discover or should discover that the warrant is overbroad, "limit the search to those areas clearly covered by the warrant or [ ] discontinue entirely their

6

search." *Id.* (citing *Garrison*, 480 U.S. at 87). "To deter Fourth Amendment violations, when the Government seeks to admit evidence collected pursuant to an illegal search or seizure, the judicially created doctrine known as the exclusionary rule at times suppresses that evidence and makes it unavailable at trial." *United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014) (en banc), *cert. denied*, 135 S.Ct. 1448 (2015) (citing *Herring v. United States*, 555 U.S. 135, 139 (2009)).

B

A defendant must have standing to challenge a search under the Fourth Amendment and to invoke the exclusionary rule. *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011) (citing *Minnesota v. Olson,* 495 U.S. 91, 95 (1990) ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (quotation marks omitted) (alterations in original)). "'[S]tanding' in the Fourth Amendment context is 'shorthand' for a 'legitimate expectation of privacy' and is not a jurisdictional requirement to pursue an argument." *United States v. Jackson*, 849 F.3d 540, 550 n.7 (3d Cir. 2017) (quoting *United States v. Stearn*, 597 F.3d 540, 551, 551 n.11 (3d Cir. 2010)). The defendant must have both an objectively reasonable expectation of privacy and a subjective expectation of privacy. *Correa*, 653 F.3d at 190. The objective prong asks whether the expectation of privacy is "one that society is prepared to recognize as reasonable." *Bond v. United States,* 529 U.S. 334, 338 (2000) (internal quotation marks and citation omitted). For the subjective prong, courts consider "whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he [sought] to preserve

7

[something] as private." *Id.* (internal quotation marks and citation omitted) (alteration in original).

C

A criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant. *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (discussing *Franks v. Delaware*, 438 U.S. 154 (1978)). In *Franks*

> the [Supreme] Court created a mechanism to allow a defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid. First, the defendant must make a "substantial preliminary showing" that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause. At the hearing, the defendant must ultimately prove by a preponderance of the evidence that: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination.

*Id.* (citations omitted). The Third Circuit has further held: "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000). "In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding." *Yusuf*, 461 F.3d at 383.

III

A

Bernard has failed to make the requisite "substantial preliminary showing" to warrant a *Franks* hearing. *See Franks*, 438 U.S. at 155. He argues that Detective Palma made material omissions knowingly or with reckless disregard for the truth by submitting an affidavit of probable cause without referencing Bernard's second-floor apartment. (Def's Br. in Support of Suppression at 18–19, ECF No. 14.) He relies primarily on Detective Kuchinsky's interview notes, which reference a second-floor apartment several times. (*Id.*) Detective Palma did not omit any reference to a specific apartment recklessly, nor did he act with "reckless disregard for the truth" or have "obvious reasons to doubt the truth of" his affidavit. *Wilson*, 212 F.3d at 783. He conducted a thorough preliminary investigation in accordance with his standard procedures. (Hr'g Tr. 57:19–25, 58:1–2.) In doing so, he viewed Bernard's residence on Google Maps, reviewed several property records, and considered information about the size and structure of the home. (*Id.* at 13:22–25, 14:1–7, 14:13–17, 16:11–25, 17:1–7.) Bernard argues Palma could have done more to determine if 5142 Harlan Street was a single- or multi-unit dwelling before submitting his affidavit of probable cause for the entire residence. But whether Palma could have done more is not the dispositive issue. His investigation was reasonably thorough and led him to reasonably (though incorrectly) conclude 5142 Harlan Street was a single-unit dwelling. In short, nothing in the record suggests Detective Palma acted with reckless disregard for the truth in swearing out the affidavit of probable cause.

B

Bernard next argues that the warrant was overbroad and invalid because it authorized officers to search all of 5142 Harlan Street despite it being a multi-unit dwelling. Bernard is correct that 5142 Harlan Street was a multi-unit dwelling, and that the warrant was therefore overbroad because it authorized a search of the entire residence. However, that fact does not invalidate the warrant because when Detective Palma applied for the warrant, he "described the structure as it was known or should have been known to [him] after reasonable inquiry under the circumstances." *Ritter*, 416 F.3d at 266 (quoting *Garrison*, 480 U.S. at 86); *see also Kao v. Markel Ins. Co.*, 708 F. Supp. 2d 472, 479 (E.D. Pa. 2010) ("[A] warrant issued for a multi-unit structure that does not specify a particular apartment may still be valid when issued, if the police officers who applied for the warrant reasonably believed, after a reasonable investigation, that the premise was in fact a single-unit dwelling.").

Because the warrant was overbroad, once Detective Palma realized 5142 Harlan Street was a multi-unit dwelling he had to either cease his search entirely or limit it "to those areas clearly covered by the warrant." *Ritter*, 416 F.3d at 266 (citing *Garrison*, 480 U.S. at 87). Whether he realized it at the time or not, he properly limited his search to areas of the home clearly covered by the warrant. He testified credibly that, upon entering the residence, he proceeded upstairs and encountered Bernard in one of the second-floor rooms. He searched the second floor and recovered a set of keys, which included a key for a safe. The second-floor search was permissible because Bernard's second-floor apartment was an "area[] clearly covered by the warrant." *Id.* Detective Palma went downstairs to the first-floor common area where he found a loaded

10

semiautomatic rifle and a safe. He used the key from the second floor to unlock the safe and discovered two more loaded semiautomatic firearms and several cards belonging to Bernard.

Bernard argues this search violated the Fourth Amendment because the first-floor area was not "clearly covered by the warrant." *Id.* The Court disagrees. First, Bernard lacks Fourth Amendment standing to challenge the first-floor search resulting in the seizure of the rifle because Detective Palma recovered the rifle in a common area where Bernard lacked a reasonable expectation of privacy. *See United States v. Acosta*, 965 F.2d 1248, 1253 (3d Cir. 1992) (tenants in multi-unit apartment buildings lack reasonable expectation of privacy in common areas); *Correa*, 653 F.3d at 191–92 (extending *Acosta* to multi-unit building with locked exterior door); *see also* (Hr'g Tr. 136:21–24, 137:5–10) (counsel for Bernard admitted at suppression hearing that Bernard did not have same expectation of privacy in rifle that he had in contents of safe). Second, although Bernard has standing to challenge the search of the safe because he had a reasonable expectation of privacy in its contents, *see California v. Greenwood*, 486 U.S. 35, 48 (1988) (Brennan, J., dissenting) (citing several cases in which the Court identified similar containers in which individuals have reasonable expectation of privacy); *see also United States v. Gricco*, No. 01-cr-90, 2002 WL 393115, at *2 (E.D. Pa. Mar. 12, 2002) (defendant had reasonable expectation in locked container stored in room where he lacked reasonable expectation of privacy), the search did not violate the Fourth Amendment because the warrant explicitly authorized Detective Palma to search for and seize safes. *See United States v. Bedford*, 519 F.2d 650, 655 n.7 (3d Cir. 1975) ("[T]he police were lawfully inside the apartment building,

[so] they could search and seize items specified in the warrant and found in common areas of the building."); *see also United States v. Kaplan*, No. 06-cr-719, 2010 WL 3620345, at *11 (E.D. Pa. Sept. 13, 2010), *aff'd,* 526 F. App'x 208 (3d Cir. 2013) (officers could search and seize items in common area of multi-unit dwelling after realizing warrant authorizing search of entire building was overbroad).

C

Even if the search of the safe violated the Fourth Amendment, suppression would not be appropriate.

When the Government seeks to admit evidence collected pursuant to an illegal search or seizure, the exclusionary rule operates to suppress that evidence and makes it unavailable at trial. *See Katzin*, 769 F.3d at 169 (citing *Herring*, 555 U.S. at 139). The exclusionary rule was developed "[t]o deter Fourth Amendment violations." *Id.*

Whether suppression is appropriate under the exclusionary rule is a separate question from whether a defendant's Fourth Amendment rights were violated. *See Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006) (citation omitted); *accord Herring*, 555 U.S. at 140. Exclusion is not a personal right conferred by the Constitution and was not "designed to 'redress the injury' occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Rather, the exclusionary rule is "a judicially created means of effectuating the rights secured by the Fourth Amendment." *Stone*, 428 U.S. at 482. The fact that a Fourth Amendment violation occurs does not mean that the evidence is automatically suppressed. *See Katzin*, 769 F.3d at 170 (citing *Herring*, 555 U.S. at 140). Indeed,

"exclusion 'has always been our last resort, not our first impulse.'" *Herring*, 555 U.S. at 140 (quoting *Hudson*, 547 U.S. at 591).

Application of the rule is instead "limited to those 'unusual cases' in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment." *Katzin*, 769 F.3d at 170 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). "Real deterrent value" alone, however, is insufficient for the exclusionary rule to apply. *Id.* at 171 (quoting *Davis*, 564 U.S. at 237). The deterrent value must also outweigh the "substantial social costs" of exclusion. *Leon*, 468 U.S. at 907. Such costs "often include omitting 'reliable, trustworthy evidence' of a defendant's guilt, thereby 'suppress[ing] the truth and set[ting] [a] criminal loose in the community without punishment.'" *Katzin*, 769 F.3d at 171 (quoting *Davis*, 564 U.S. at 237). Because this result runs contrary to the truth-finding functions of judge and jury, "exclusion is a bitter pill, swallowed only as a last resort." *Id.* (citations and internal quotation marks omitted). Accordingly, exclusion is warranted "where the deterrent value of suppression . . . overcome[s] the resulting social costs." *Id.* (citing *Davis*, 564 U.S. at 237).

The good faith exception to the exclusionary rule "was developed to effectuate this balance and has been applied 'across a range of cases.'" *Id.* (quoting *Davis*, 564 U.S. at 238). *Leon* and its progeny highlight that "the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Davis*, 564 U.S. at 238 (quoting *Herring*, 555 U.S. at 143). The deterrent value of suppression tends to outweigh the costs "[w]here officers exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights." *Id.* (quoting *Herring*, 555 U.S. at 144). When

the police act with an "objectively reasonable good-faith belief" in the legality of their conduct, or when their conduct "involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (citations and internal quotation marks omitted). Accordingly, discerning "whether the good faith exception applies requires courts to answer the 'objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.'" *Katzin*, 769 F.3d at 171 (quoting *Herring*, 555 U.S. at 145).

Even if Detective Palma's search of the safe—retrieved during a common-area search and opened using a key properly obtained during the second-floor search—violated the Fourth Amendment, the good faith exception would apply. The Court cannot conclude that a reasonably well-trained officer would have known that searching the safe was illegal in light of all the circumstances. *See id.* At worst, an illegal search of the safe would be "only simple, isolated negligence," *Davis*, 564 U.S. at 238 (citation omitted), because Detective Palma knew (or reasonably should have known) he was in a common area of the home and had a warrant to search safes found therein. This objectively reasonable belief in the legality of the search minimizes the deterrent value of suppression in this case. Conversely, the social costs of suppression would be extremely high because suppression would involve "omitting 'reliable, trustworthy evidence' of [Bernard's] guilt." *Katzin*, 769 F.3d at 171 (quoting *Davis*, 564 U.S. at 237). That social cost significantly outweighs the deterrent value of suppression here.

An appropriate Order follows.

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J
