IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NUMBER 20-208 |
| | : | |
| OMAR BERNARD | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

The Presentence Report drafted by United States Probation Officer Elizabeth Powell sets Omar Bernard's Guidelines sentencing range at 180-210 months based on an offense level of 30 and a criminal history category of VI. The defense objects to this computation and asserts that the offense level is 26 with a criminal history category of VI. Thereby, making the recommended guideline range 120 to 150 months. As set forth in detail below, a sentence in this range would be sufficient to achieve the goals of sentencing in Mr. Bernard's case based on ll of the sentencing factors enumerated in 18 U.S.C. § 3553(a), the *United States v. Booker*, 543 U.S. 220 (2005), and its progeny.

**I.      PROCEDURAL HISTORY**

On July 14, 2020, the United States Attorney's Office in the Eastern District of Pennsylvania filed a one-count Information charging the defendant, Omar Bernard, with felony in possession of a firearm, in violation of 18 U.S.C. § 922 (g) and 924(e).

On July 27, 2021, the defendant appeared before the Honorable Gerald J. Pappert and pled guilty to the one-count Information. Sentencing is scheduled for November 5, 2021.

**II.     DEFENDANT'S PERSONAL HISTORY**

Omar Bernard is a 39-year-old man who was born and raised in Philadelphia, Pennsylvania. Mr. Bernard's parents (Celestine Bethea and Harry Bernard) were never married, and his mother was a mere 13 years old when she gave birth to him. His father, who was 21 at the time, never helped support Mr. Bernard.

Mr. Bernard, who is the oldest child, reports that his mother worked in a grocery store when he was a child; but she struggled to provide financially for him and his younger siblings. Consequently, Mr. Bernard's maternal grandparents played a substantial role in his younger years providing financial support for the family and assisting in caring for Mr. Bernard.

Even with their financial woes, Mr. Bernard and his siblings were close when he was growing up. The neighborhood that they grew up in can be best described as tumultuous. Violence and drugs permeated many of the households, and Mr. Bernard's home was no exception.

From a very young age, Mr. Bernard witnessed his parents' physical altercations. By the time Mr. Bernard entered school, his father was heavily influenced by a crack addiction. This addiction prevented Mr. Bernard's parents from having a stable relationship. The couple lived together on and off, but the drugs turned him into a violent and chilling version of himself. Oftentimes the altercations would be so violent that law enforcement had to intervene.

This had a profound impact on Mr. Bernard. He loved and idolized his father, even though the image of manhood created by him was not a positive one. He grew up believing that real men didn't have to be dependable, affectionate or drug free. In essence, his exposure to his father's drug fueled violence robbed him of the innocence of his youth and lead him down a self-destructive path.

Mr. Bernard's father was not the only negative role model in his life. Unfortunately, many of the corners in his neighborhood were replete with negative examples of manhood, and it wasn't long before Mr. Bernard joined them in their anti-social behaviors. In elementary school, Mr. Bernard was a good student; but the allure of drugs and street life pulled him away from academics. He began smoking marijuana in his freshman year of high school. The drug made him forget about the financial woes of his family and the violent attacks he witnessed his mother endure. It was a way to escape, and it wasn't long before Mr. Bernard used drugs to replace all the pro-social aspects of his life. By the time he was in his sophomore year of high school, Mr. Bernard had a grade point average of 0.0, and he withdrew from school.

After leaving high school, Mr. Bernard realized there were very few opportunities for a 15-year-old drop-out in the job market. His mother was caring for his younger siblings and Mr. Bernard began to feel as though his very existence was a burden on her. It was this feeling, and the example of his father who would regularly sell drugs to support his own habit, that lead Mr. Bernard into the drug trade.

Mr. Bernard was convicted on a number of occasions for possession with intent to deliver in Philadelphia County. Each conviction was made up of small-scale street sales. Eventually, his activity led him to state detention. While in state custody, Mr. Bernard resolved that he was going to change his life. He decided to seek a life outside of the confines of the North Philadelphia neighborhood that had groomed him for a life of incarceration. He had an aunt who had moved to Wilkes Barre, Pennsylvania and he made her residence his home plan when he was released from state custody.

Upon his release, Mr. Bernard worked tirelessly to stay clean and sober and to find a job. He applied for positions throughout the small town, but his criminal record, lack of experience,

and lack of transportation hampered his efforts to find a job.  After a few months, his aunt grew impatient and insisted that Mr. Bernard find a way to financially contribute to her home.  The pressure of having to find employment and stay clean and sober was overwhelming. Believing the stability of his housing to be in jeopardy, Mr. Bernard began to use and sell drugs again which led to another period of incarceration.

It has been an incredibly gloomy cycle for Mr. Bernard.  Each time he sought to escape his family history of addiction and poverty, he found himself immersed back into that world. In the instant case, Mr. Bernard was under the influence of oxycodone and marijuana during the commission.  Mr. Bernard is desperately seeking to end this cycle.

The bright spot in Mr. Bernard's life is his son Omir.  Omir is a young adult with a budding music career.  He has managed to escape the trapping of the streets, although sadly the music industry has attempted to shun him because he opted for good citizenry over protecting the criminal activity of others.  When Omir was just 14 years old, he witnessed a homicide.  The event was traumatic, but the younger Mr. Bernard cooperated with law enforcement in an effort to bring that person to justice.  Now as an adult, many "stars" in the music industry have decided not to "tarnish" their own reputation by working with someone who assisted law enforcement.  It is a skewed mentality, but a mentality shared by many in the community where Mr. Bernard grew up.  He hopes to one day show his son that making the right decisions might be difficult, and it may lead to a longer road to success; but it is paramount. Mr. Bernard wants a better life for himself, and he wants to be a better example for his son.  That is why he has accepted responsibility of his actions in this case.

### III.    SENTENCING GUIDELINE COMPUTATION

The defense disagrees with the PSR that the applicable guidelines recommend a sentence of 180 to 210 months incarceration for this offense. The defense asserts that Mr. Bernard's conviction under 35 P.S. § 780-113(a)(30) is not a serious drug offense under 18 U.S.C. §924 (e), hereinafter "ACCA."

In order to address this question, the Court must look toward the categorical approach. *See Shular v. United States*, 140 S. Ct. 779, 783 (2020). The question is whether the state offense is broader than the federal definition, *i.e.* whether "the state offense's elements necessarily entail one of the types of conduct identified in [18 U.S.C.] § 924(e)(2)(A)(ii)." *Id*. at 784. The question is whether "the state offense allows for conviction on a broader basis" than the federal definition. *Id*.[1] Section 780-113(a)(30) is broader than the definition of serious drug offense, and therefore is not a qualifying predicate.

Section 780-113(a)(30) prohibits three types of drug conduct by an unregistered person or unlicensed practitioner: manufacture, delivery, and possession with intent to manufacture or deliver. "Delivery," in turn, is broadly defined as any transfer of a controlled substance from one person to another (§ 780-102(b)(¶16)), which includes administering (§ 780-102(b)(¶1)), dispensing (§ 780-102(b)(¶20)), and distributing (§ 780-102(b)(¶22)).[2] Thus, the text of § 780-113(a)(30) and these definitional provisions clearly provides that an unlicensed practitioner may be prosecuted under § 780-113(a)(30) for administering a controlled substance.

---

[1] The so-called modified categorical approach is not applicable here, because § 780-113(a)(30) is not divisible by the various types of conduct that it prohibits (manufacture, delivery, or possession with intent to manufacture or deliver). And even if it were so divisible, the *Shepard* documents in this case do not specify the particular basis for the conviction.

[2] "Administer" means to directly apply a controlled substance to the body of a patient or research subject (*e.g*., by injection or oral ingestion). 35 P.S. § 780-102(b)(¶1). "Dispense" means to deliver a controlled substance pursuant to a lawful prescription. 35 P.S. §780-102(b)(¶20). "Distribute" means to deliver a controlled substance "other than by administering or dispensing." 35 P.S. § 780-102(b)(¶22).

The definition of a serious drug offense, by contrast, does not include the broad conduct "delivery." Instead, serious drug offense is limited to manufacturing, distributing, and possession with intent to manufacture or distribute. 18 U.S.C. § 924(e)(2)(A)(ii). Additionally, the difference between § 780-113(a)(30) and the federal definition is "administering"—the state offense *includes* it (through Pennsylvania's broad definition of "delivery") while the federal definition *excludes* it. Section 780-113(a)(30) is therefore broader than the federal definition, and not a qualifying predicate.

Furthermore, Mr. Bernard need not identify a Pennsylvania case in which an unlicensed practitioner was prosecuted for administering a controlled substance. *Cf. United States v. Daniels*, 915 F.3d 148, 151 (3d Cir. 2019) (addressing "realistic probability" inquiry of *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007) in case not involving facial overbreadth of statutory text). That is because the realistic-probability inquiry simply does not apply where—as here—the text of the state statute is, on its face, broader than the federal definition. *See Cabeda v. Attorney General of U.S.*, 971 F.3d 165, 176 (3d Cir. 2020).

Mr. Bernard should not be subjected to the Chapter 4 guideline enhancement pursuant USSG §4B1.4(b)(3)(B). Conversely, the defense asserts that Mr. Bernard's adjusted offense level should be 29, and with a 3-point reduction for acceptance of responsibility, his total offense level should be 26. There would be no change in his criminal history category because even without an enhancement pursuant to USSG §4B1.4(c)(1), (2), or (3), Mr. Bernard's criminal history category would be VI. Therefore, the defense asserts that the recommended guideline range should be 120 to 150 months.

### IV. <u>SENTENCING CONSIDERATIONS</u>

In the present case, the Court must consider all of the factors identified in 18 U.S.C. § 3553(a) to craft a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. 18 U.S.C. § 3553(a)(1). Counsel submits that the factors weigh as follows in Ms. Bernard's case:

### A. The Nature and Circumstances of the Offense and Ms. Bernard's History and Characteristics

Ms. Bernard's history and characteristics weigh in favor of a sentence within the recommended guidelines as calculated by the defense herein. As discussed above in the personal history section, Ms. Bernard's criminal activity was fueled by his lack of judgement brought on by his drug addiction.

He understands that his actions were wrong and has accepted full responsibility for them. As the Supreme Court noted most recently in *Pepper*, these details of Ms. Bernard's life are considerations that are "[h]ighly relevant – if not essential – to [the] selection of an appropriate sentence." *Pepper*, 562 U.S. 476, 131 S. Ct. at 1240 (insertions in *Pepper*) (internal quotation marks and citations omitted). Mr. Bernard's character and history weigh in favor of a sentence within the guidelines as proffered by the defense.

### B. The Need for the Sentence Imposed to Promote Certain Statutory Objectives

*1. To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.*

There can be no doubt about the serious nature of the offense in this case. Mr. Bernard was found to be in possession of firearms at a time when gun related activity is on the rise in this jurisdiction. The court, however, should recognize that Mr. Bernard has accepted full responsibility for his actions in this matter and is facing a significant period of incarceration in this case.

He is keenly aware that his predicament is of his own making, and the stress these events have had on his entire family are all consequences of his own actions. Mr. Bernard does not seek to justify or minimize his actions. He understands that as a result of the choices he has made in his life, he has forever foregone his ability to possess a firearm. He also understands the impact that gun violence has had on his community as a whole. He wants to gain more insight into the origins of his addiction, so that he might not fall back into the lack of judgement it has caused him to live with all these years. When considering a just punishment and weighing it against his personal characteristics, a sentence within the guidelines proffered by the defense, in this particular case, is more than adequate to achieve this statutory objective.

      2.     *To afford adequate deterrence to criminal conduct.*

Similarly, Mr. Bernard is facing a significant federal sentence in this case. While it is true that this would not be his first time incarcerated, without a doubt this is the most significant sentence he has ever faced. There can be no doubt that any similarly situated individual would be deterred by the prospect of spending over a decade in prison.

Moreover, it is well-established that the *certainty* of punishment, not the *severity* of it, has the most significant general deterrent effect. *See*, *e.g.*, CESARE BECCARIA, ON CRIMES AND PUNISHMENTS AND *OTHER* WRITINGS 63 (Richard Bellamy, ed.; Richard Davis, trans., Cambridge University Press 1995).

      3.     *To protect the public from further crimes of the defendant.*

Ms. Bernard's personal experience in this case, taken together with a Guideline sentence, will provide sufficient individual deterrence against Ms. Bernard repeating this, or any other, offense. At this point, Mr. Bernard understands that the best example he can serve for his son is as a cautionary tale, and one of eventual redemption. He is working fervently to break the cycle

within his own family and provide the only protection he can to his son at this point. The protection of knowing that the life Mr. Bernard has led, thus far, is not the life Omir should aspire to achieve. Mr. Bernard is keenly aware that any additional criminal conduct will most likely result in him losing all contact with his son. That is a risk, he is simply unwilling to take.

Additionally, this period of incarceration will allow Mr. Bernard to benefit from the programming available inside the Bureau of Prisons. Specifically, confronting his addiction issues alongside participating in vocational training will help ensure that when he is released from custody, Mr. Bernard will be able to remain arrest free. When taken in the greater context of her entire life, there is a very low likelihood that Mr. Bernard will re-offend in any way given his recognition of the seriousness of this offense and its consequences as well as all he would lose were he to violate the terms of a Guideline sentence. For all these reasons, the Court can be assured that a Guideline sentence will adequately protect the public against further crimes by Mr. Bernard.

> 4. *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

Mr. Bernard has already obtained his G.E.D., but he is in need of vocational training to assist his re-entry to the community. Although, Mr. Bernard is an adult in many ways he has not been equipped to handle life in the community. Drug treatment and mental health counseling will be paramount in helping Mr. Bernard establish roots upon his return to the community and remain arrest free.

**C.** **Kinds of Sentences Available**

The range of sentences statutorily available to the Court is listed in Part D of the PSR. This range includes a sentence of incarceration of up to life imprisonment years, 5 years supervised release, a fine of up to $250,000, and a mandatory special assessment of $100.

The Court must also consider that a sentence within the proffered guidelines is permissible here. *See Gall*, 552 U.S. at 59 & n.11. (But the Guidelines are not mandatory, and thus the range of choice dictated by the facts of the case is significantly broadened. Moreover, the Guidelines are only one of the factors to consider when imposing a sentence, and § 3553(a)(3) directs the judge to consider sentences other than imprisonment.") (internal quotation marks omitted).

### D. The Sentencing Range Established by the Sentencing Commission

As noted herein, the defense objects to the calculation of the advisory Guidelines as proffered by the U.S. Probation office. The defense contends that the total offense level is 26, that the criminal history is Category VI, and that the corresponding advisory guideline range is 120-150 months. As has been discussed, and is further discussed below, a sentencing within this advisory guideline range would be sufficient but not greater than warranted to achieve the statutory objectives.

### E. The Need to Avoid Unwarranted Disparities and Unwarranted Similarities

The Court must bear in mind that not only is § 3553(a)(6) not "concern[ed] with disparities resulting from the normal trial and sentencing process," *Pepper*, 562 U.S. 476, 131 S. Ct. at 1248[3], its command to avoid unwarranted disparities carries with it "the need to avoid

---

[3] The Supreme Court goes on to state that "[t]he differences in procedural opportunity that may result because some defendants are inevitably sentenced in error and must be resentenced are not the kinds of 'unwarranted' disparities that Congress sought to eliminate under § 3553(a)(6)." *Id.*

10

unwarranted *similarities*." *Gall*, 552 U.S. at 55 (emphasis in original). Where, as here, a defendant's personal history and characteristics warrant a lower sentence than that imposed on a defendant charged with a similar crime, the difference between the sentences is warranted and just. *See Pepper*, 562 U.S.476, 131 S. Ct. at 1252 (Breyer, J., concurring) ("A just legal system seeks not only to treat different cases differently but also to treat like cases alike. Fairness requires sentencing uniformity as well as efforts to recognize relevant sentencing differences.").

## V.  CONCLUSION

Based on the above reasons, the defense respectfully requests the Court sustain the defense's objections to the pre-sentence report and sentence Mr. Bernard within the defense proffered recommended guidelines.

    Respectfully submitted,

    /s/ Natasha Taylor-Smith
    NATASHA TAYLOR-SMITH
    Assistant Federal Defender

# CERTIFICATE OF SERVICE

I, Natasha Taylor-Smith, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have electronically filed and served a copy of the Defendant's Sentencing Memorandum and Request for Variance, by electronic notification and/or hand delivery to his office, upon Robert Livermore, Assistant United States Attorney, office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

/s/ Natasha Taylor-Smith
NATASHA TAYLOR-SMITH
Assistant Federal Defender

DATE:     October 29, 2021